UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL No. 1:19-cr-10195-WGY |
| HAOYANG YU, *et. al.*, Defendants | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS INDICTMENT DUE TO VINDICTIVE PROSECUTION AND OUTRAGEOUS GOVERNMENT MISCONDUCT**

The United States Attorney's Office (USAO) sought the Superseding Indictment in this case because the investigation produced new and damning evidence of the defendants' serious crimes. This new information educated the government about the scope and character of defendant Haoyang Yu's wrongdoing. As just two examples, following the initial indictment, the government learned that Yu had knowingly sold stolen computer chips to Turkey's largest defense electronics company. It also learned that Yu had stolen the files necessary to manufacture computer chips containing a sensitive technology with military applications. New information also included evidence against Yu's wife, now co-defendant Yanzhi Chen, who confessed to her role in conceiving Tricon MMIC, LLC ("Tricon"), and executed crucial financial transactions on its behalf.

The Court should reject the defendants' baseless claims that they are the victims of prosecutorial vindictiveness and outrageous government misconduct. Dkt Nos. 104, 105, 106. The government engaged Yu's counsel in plea discussions for ten months. Even as it accumulated new incriminating evidence, the government attempted in good faith to resolve the case in a manner that was fair to Yu and in the interests of justice. The government's conduct was proper.

## I.  FACTS

Federal agents began investigating Tricon in 2018, when industry representatives notified various U.S. government agencies that they believed the company was committing a crime. The

investigation proceeded covertly until shortly after May 22, 2019, when agents learned that Chen had received a new shipment from Win Semiconductors Corp. ("Win"), a Taiwanese computer chip manufacturer.  Federal agents inspected the shipment, which contained a gallium arsenide wafer onto which hundreds of computer chips were mounted.  Each chip could be removed, repackaged, and sold to Tricon's customers, thereby causing further injury to Analog Devices, Inc. ("ADI"), the victim company from which Yu had stolen the chip designs.

Partly for this reason, the government accelerated its timetable.  On June 11, 2019, it obtained several search warrants and an arrest warrant for Yu.  The Grand Jury also returned the original indictment, which charged Yu with 15 counts of trade secret and other crimes.  Dkt. No. 1.  The indictment referred to Chen and her role in the illegal scheme, but it did not charge her. *Id.* at ¶¶ 1, 6-7. On June 14, 2019, government agents executed the warrants, including one authorizing the search of Yu's home and the seizure of the digital devices inside.  After Yu's arrest, agents analyzed those devices and followed-up on other leads.   Contrary to the defense's assertions, the story of the Superseding Indictment is not one of prosecutorial vindictiveness or outrageous misconduct.  It is the story of the evidence that the continuing investigation uncovered in the 15 months following Yu's arrest.  This new evidence informed prosecutorial decisions regarding what new charges were possible and should be brought in the Superseding Indictment, ultimately returned on October 1, 2020.  That new evidence is discussed in detail below.

###    A.      Chen's Confession

On June 14, 2019, government agents interviewed Chen, who provided incriminating detail about Tricon's criminal scheme and her role in it.  Specifically, Chen made the following remarks.

"My husband took something from ADI."  Dkt. No. 102-3 at 75:1.  "I know my husband not do good things."  *Id.* at 78:7.  Tricon's designs were "90 percent of – 80 percent the same" as ADI's designs.  *Id.* at 99:1-2.  "Besides ADI, … everything is legal."  *Id.* at 90:1-7.  Chen had an MBA and "some business sense."  *Id.* at 35:13-18; 23:8.  "I think probably it was my idea to suggest him to run the business."  *Id.* at 115:24-25.  The couple put the company in Chen's name because it was "just easier" and "probably" to prevent others from linking the company to Yu;

2

they knew he had a "conflict," and he knew taking information from ADI was wrong. *Id.* at 87:16-25; 20:17-19; 52:3-10; 91:10-23. Chen helped with some planning for the company and with the design of the website. *Id.* at 84:16–85:6; 99:7-13. Chen was a signatory on Tricon's Bank of America account: She deposited customer checks and wired money to Win. *Id.* at 30:1–32:6; 107:13-20. Chen ordered packaging, labeled Tricon shipments, and delivered them to UPS. *Id.* at 26:12-15; 27:12–28:20; 29:5–30:17; 39:5-15.

This detail regarding Chen's knowledge of Tricon's criminal scheme and her facilitation of it had previously been unknown to agents. It supported bringing charges against her.

### B.   Bank of America Records

On September 26, 2019, the government subpoenaed Bank of America ("BoA") records relating to Tricon's two business accounts. Returns received in October 2019 confirmed that Chen was the signatory on both accounts and that she had described herself as "manager" of the business. This new evidence further supported charges against Chen.

### C.   Win Semiconductors Records

On October 24, 2019, two federal agents interviewed employees of Win, the company that manufactured Tricon's computer chips. Following the meeting, Win began producing relevant documents and continued to do so into the summer of 2020. These materials were the principal basis of several new charges in the Superseding Indictment.

Specifically, Win provided the customer information form that Tricon had submitted to establish an account with the foundry. This document is the principal basis of Superseding Indictment Count 16. Dkt. No. 78 ¶ 35. It listed Chen as Tricon's president, major shareholder, and point of contact for all billing, shipping, payment, sales, and technology-related inquiries. *Id.* at ¶ 16. In a section titled "Business Advantage," Tricon made the following false claim: "Our IP gives us a leg up against our competitors." *Id.* The intellectual property did not belong to Tricon, of course; Yu had stolen it from ADI.

Next, Win provided BoA records specifically connecting Chen to Win's payments. In particular, the company sent two documents confirming that Chen had initiated wires from

Tricon's account in the U.S. to Win's account in Taiwan.  Each transfer was for more than $35,000.  Each document named Chen as the person requesting the transfer, stated she had done so in person, and indicated that the teller had verified her identity with her driver's license.  These documents are the principal evidence supporting Superseding Indictment Counts 17 and 18, charging Chen and Yu with wire fraud.  *Id.* at ¶¶ 18-19, 35.

Finally, Win provided copies of the stolen design files that Yu had transferred to the foundry and internal documents confirming when those files had arrived in Taiwan.  This evidence was instrumental in allowing the government to bring Superseding Indictment Counts 19 and 20, which allege that Yu internationally transported stolen goods.  *Id.* at ¶¶ 17, 19, 37.  It also supported Superseding Indictment Counts 21 and 22, which allege that one of Yu's electronic transfers of stolen technology contained data whose export is controlled for national security reasons.  *Id.* at ¶¶ 20-24, 39.  Prior to receiving the Win documents, the government could not prove which files Yu had transmitted out of the country and when he had done so.  Moreover, although agents knew that Tricon's website advertised chips subject to national security export controls (*e.g.* ECCN 3A001), agents did not know whether Yu had actually manufactured or distributed those chips abroad.  Win's information showed that he did.

**D.    Evidence Extracted from Yu's Electronic Devices**

On June 14, 2019, agents executed a search warrant allowing them to seize numerous electronic devices from the defendants' residence.  Subsequent analysis showed that the devices contained voluminous and damning evidence – including technical data, hundreds of stolen ADI files, chat messages, emails, and other documents – clarifying the scope and character of the defendants' crimes.  Some of the most concerning evidence demonstrated that Yu had stolen technology sometimes used in U.S. military applications, as discussed below.  Also of concern was the fact that Yu had sold products to foreign countries.  As just two examples, Yu had knowingly sold stolen chips to Turkey's largest defense electronics company and intellectual property to a Chinese company, also discussed below.  In combination with other new evidence,

this information warranted new charges, specifically Superseding Indictment Counts 23 and 24, which allege Yu's immigration fraud.  *Id.* at ¶¶ 25-17, 41, 43.

### 1.     *Yu Stole Technology Used in Military Applications.*

Yu's computers held exact copies of several ADI trade secret files kept on the company's secure servers.  Some of these files could be used to manufacture chips with gallium nitride ("GaN") technology.  GaN is a semiconductor material that can efficiently amplify high power radio frequency signals and, thereby, enhance a system's range.  The U.S. military places chips with this technology in jammers that allow fighter jets to fly undetected and that allow soldiers to prevent the detonation of improvised explosive devices.[1]  Because of its sensitivity, the United States requires that all chips containing this technology be manufactured domestically.  Yu's possession of these GaN files posed a national security concern and formed the basis of Superseding Indictment Counts 10 and 11.  *Id.* at ¶¶ 10, 33.[2]

### 2.     *Yu Sold Stolen Chips for Use in Turkish Defense Systems.*

Emails, chat conversations, invoices, and other evidence show that Yu knowingly provided his boosted chips to a Turkish military supplier.  This was and remains a national security concern.

Yu's customer was Aselsan, Turkey's largest defense electronics company.[3]  According to information on Yu's electronic devices, an Aselsan employee emailed Tricon in April 2018 and requested a quote for a series of MMIC chips.  The employee's signature indicated that he was a purchasing engineer for the company.  A few hours later, Yu chatted electronically with a friend and asked what he knew about Aselsan, which Yu described as "in Turkey."  "It's an awesome company," the friend replied.  "It mainly works on government contracts."[4]  Records from Yu's

---

[1] A fuller discussion of the dimensions and importance of this evidence is at Dkt. No. 94 at 4-6.  The government incorporates that discussion into this opposition.

[2] A third file did not contain GaN information but held designs for several unreleased ADI products.  It formed the basis of Superseding Indictment Count 9.  Dkt. No. 78 ¶¶ 10, 33.

[3] *See* https://www.aselsan.com.tr/en/about-us/who-we-are.  The website states that Aselsan was established to meet the communication needs of the Turkish Armed Forces by national means.

[4] Many of Yu's electronic device records – including chat messages, contracts, and other documents – were written in Chinese.  Quotations and descriptions in this motion rely on draft summary translations by FBI linguists.

Case 1:19-cr-10195-WGY   Document 110   Filed 05/03/21   Page 6 of 22

electronic devices show that Yu quickly mailed three samples to Turkey and that, in November 2018, the company ordered 25 pieces of TM5024. This chip is Tricon's copy of the ADI part named HMC460. Yu created a shipping label and sent Aselsan an invoice charging $2,900. BoA records confirm that Aselsan sent the satisfying wire to Tricon's business account. Evidence obtained after the Superseding Indictment confirmed that the Aselsan employee had informed Yu prior to the shipment that his order was for "a defence [*sic*] system" and that the chips would be used in "the front end units of EW [electronic warfare] systems developed by Aselsan."

### 3.    *Yu Sold Intellectual Property to a Chinese Company.*

As another example of Yu's international business, information on his electronic devices shows that, in 2018, he sold intellectual property to a Chinese company. The data also provide good evidence that the end-user of this transaction was Huawei Technologies Co. ("Huawei"). This Chinese company designs, develops, and sells telecommunications equipment and consumer electronics. Since mid-2018, Huawei has been the subject of U.S. sanctions.[5]

Specifically, Yu's electronic devices included a copy of an August 2018 contract executed by Yu and Shanghai Qilu Information Technology Co. ("Qilu Tech"). The contract bound Tricon to design and test a MIMO pre-driver for Qilu Tech, a company based in Shanghai.[6] Afterward, all intellectual property rights – including the design's trade secrets, patents, and copyrights – would belong to Qilu Tech. In exchange, Qilu Tech would pay Tricon a total of $50,000 in three installments. The project's logistical, financial, and technical details are described in other documents found on Yu's electronic devices. These include scores of Chinese-language chat

---

[5] In 2018, due to national security concerns, the United States banned Huawei networking equipment from domestic 5G networks. In 2019, the Federal Communications Commission designated Huawei a national security threat and the U.S. Department of Commerce added Huawei and affiliated entities to the Entity List. Since then, the United States has imposed export controls designed to cut off the company's U.S. supply of high-end chips and advanced chipmaking equipment, effectively crippling Huawei's ability to make high-end smartphones.

[6] According to open sources, MIMO is a common acronym for "multiple-input/multiple-out." This technology allows wireless communications devices to send and receive multiple data signals simultaneously over the same radio channel. A pre-driver is one portion of required hardware.

messages sent between May 2018 and May 2019.  Ultimately, Yu sent Qilu Tech invoices for $10,000 and $35,000 in August and December 2018.  Tricon's BoA account received corresponding wires for the same.

It is important to note that this transaction remains under investigation.  The government does not currently believe that it involves Yu selling ADI's intellectual property.  Instead, we have reason to believe – but have not yet confirmed – that the property may belong to another victim company.  However, the evidence linking Yu's project to Huawei is strong.  This includes but is not limited to his having written to a friend on August 11, 2018 – during the pendency of the project – and saying, "I currently have a project where the end user is Huawei."

Finally, the government notes that, since the Superseding Indictment, evidence of Yu's foreign dealings has expanded.  For example, the government has obtained emails showing that, in mid-2018, Yu corresponded with an Indian company and advertised his ability to provide "Space and Mil Grade Components."  Other emails show his correspondence with an Israeli company seeking to replace ADI products.  Still others give new detail about sales of stolen chips to Spain, transactions of which the government was aware prior to the initial indictment.

### E.  Yu's Plea Negotiations

The government raised the possibility of plea negotiations to Yu's counsel in December 2019 and pursued those negotiations for ten months, through September 2020.  During this time, the government was candid with the defense about its increasing evidence but also sincere in its efforts to find a resolution that would both be fair to the defendant and serve the interests of justice.  In the end, despite a good faith effort to resolve the case, the parties were unable to agree.  The government attributes this largely to Yu's desire for government assurances that his felony convictions would not result in immigration consequences, a promise the USAO does not have the authority or jurisdiction to make.

More specifically, on December 5, 2019, the government emailed the defense and said that it had developed additional evidence.  It invited the defense to discuss the evidence in person and explore the possibility of a plea before the government sought a superseding indictment.  The

parties met on January 8, 2020.  There, the government made a detailed presentation of its case, including the new evidence it had developed from Yu's electronic devices, the search of his residence, and Win.  It presented a timeline of key dates in the criminal scheme.  It described how new evidence might apply to Chen.  The government had named but not charged her in the original indictment largely because the government was not yet confident in the extent of her role.  However, as the government informed the defense, that assessment was changing.[7]  The government discussed potential new allegations against Yu and said that a superseding indictment would likely charge immigration fraud.  The parties reviewed the Guidelines and calculated the effects of pleas to various charges and loss amounts.

In the weeks that followed, there was a good-faith give-and-take.  The government produced additional discovery, answered evidentiary questions, and explained its theories for export and wire fraud charges.  The defense affirmed that Yu was still interested in a plea.  It sent a detailed email regarding loss calculations, export violations, and immigration consequences.  The parties met again on March 10, 2020.  Negotiations continued by phone and email after the COVID-19 pandemic began.  Throughout the process, both parties suggested resolutions that would have required Yu's pleading guilty to a subset of the charges in the initial indictment.

To inform discussions, and with a looming October trial date, the government provided the defense on September 9, 2020, with a draft superseding indictment almost identical to the one the Grand Jury returned.  The undersigned explained that the document was still subject to change but that the government planned to present something similar to the Grand Jury in the next week.  The undersigned also offered to delay that presentation if the defense still wanted more time to discuss a plea resolution.  On September 14, 2020, the government filed an assented-to motion requesting continuation of the trial date.  Dkt. No. 73.  The motion stated that the parties were discussing a non-trial resolution and that, among other things, the conversation involved "the defendant's review and consideration of additional evidence and potential new charges, which the government

---

[7] By January 2020, Chen had hired separate counsel, who also spoke with the government.

8

may elect to pursue in a superseding indictment." *Id.* at 1.  In the end, the government delayed its Grand Jury presentation, but discussions remained unfruitful.  The government's last record of plea discussions is a substantive email it sent on September 26, 2020.  The email followed-up on immigration and export issues and asked a question of the defense; to date, there has been no reply.

On October 1, 2020, the Grand Jury returned the Superseding Indictment.  Dkt. No. 78.  At that time, the court had denied one defense pretrial motion.  Dkt. No. 69.  The parties had filed pleadings relating to two other motions, but the court had yet to hear argument.[8]  Dkt. No. 84.

Finally, of particular relevance to this motion is an email exchange that the parties shared on February 13, 2020.  In the first email, the defense stated that Yu might not be able to honestly say that his plea was voluntary if it were entered to avoid having the government charge Chen. The government quickly responded denying that it was – as the defense had phrased it – attempting to "coerce" Yu into a plea.  The defense replied nearly immediately and clarified that it "wasn't meaning to allege some kind of misconduct but simply to express the difficulty of the situation in which Mr. Yu finds himself."  The government found no subsequent mention of this issue in the parties' correspondence.  It was surprised to see the issue raised here, especially considering that plea discussions continued for another seven months.

## II.  THE LEGAL STANDARD

### A.  Prosecutorial Vindictiveness

There is no evidence to support the defendants' claim that they are the victims of prosecutorial vindictiveness.  United States District Judge Gorton framed the proper inquiry for this allegation in *United States v. George*.  839 F. Supp. 2d 430 (D. Mass. 2012).  There, he wrote:

> To establish prosecutorial vindictiveness, a defendant must show that the prosecutor harbored genuine animus toward him and that he would not have been prosecuted but for that animus. A defendant who lacks direct evidence of a vindictive motive can establish a rebuttable presumption of vindictiveness by demonstrating circumstances that reveal a sufficient likelihood of vindictiveness. *Raising such a presumption is especially*

---

[8] The court has since denied a second defense pretrial motion and kept a third under advisement.  Dkt. No. 89.

> *difficult in a pretrial setting*, however, given that a prosecutor is afforded broad discretion to determine whom should be prosecuted and for what crime and is presumed to have exercised that discretion in good faith.

*George*, 839 F. Supp. 2d at 441 (citations omitted) (emphasis added).  *See also United States v. Marrapese,* 826 F.2d 145, 147 (1st Cir. 1987).

The difficulty in raising a pretrial presumption is even more arduous in the context of plea negotiations.  Since 1982, virtually every court that has reviewed claims of vindictiveness in a plea bargaining context has rejected the claim.  That was the year the Supreme Court decided *United States v. Goodwin,* 457 U.S. 368, 381 (1982).  In *Goodwin*, the Supreme Court carefully distinguished pretrial and post-trial procedures and discussed the "good reason to be cautious" before adopting a per se presumption of prosecutorial vindictiveness in a pretrial context.  *Id.* at 382.  The Court explained that, while preparing for trial, a prosecutor might uncover additional information suggesting a further basis for prosecution – or may simply realize her evidence has greater significance.  *Id.*  The Court thus noted the unlikelihood that a prosecutor had fully "crystallized" her assessment of the case in its early stages, unlike when a trial had already begun or when a conviction had already been delivered.  *Id.*  The Court noted that prosecutors reasonably expect defendants to bring pretrial motions and exercise other procedural rights.  *Id.*  Thus, it is unrealistic to assume that a prosecutor's response to such motions, including bringing new charges, is designed to punish and deter.  *Id.*  "A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution," the court wrote.  *Id.* at 382.  "An initial decision should not freeze future conduct."  *Id.*

The First Circuit and other appellate courts have more recently articulated these principles – namely, that a presumption of vindictiveness almost never applies in a pretrial setting and that new charges alone don't raise one.  *See United States v. Stokes*, 124 F.3d 39, 45 (1st Cir.1997) ("courts should go very slowly in embracing presumptions of prosecutorial vindictiveness in pretrial proceedings."); *United States v. Young*, 955 F.2d 99, 108 (1st Cir. 1992) ("the mere bringing of a new indictment with added counts is not in itself vindictive behavior, nor does it raise a presumption of vindictiveness."); *United States v. Cooper*, 461 F.3d 850, 856 (7th Cir. 2006)

(the "presumption of vindictiveness does not apply to pretrial decisions by the prosecution").  In the extremely rare instance that a pretrial presumption of vindictiveness is found, the government may rebut it by demonstrating that the new charge has been brought for some objective reason other than punishment.  *Goodwin*, 457 U.S. at 376 n.8.  For instance, new evidence, like that found here, is a legitimate, non-vindictive reason for bringing a new charge.  *Id.* (*citing Blackledge v. Perry*, 417 U.S. 21, 29 (1974) ("This would clearly be a different case if the State had shown that it was impossible to proceed on the more serious charge at the outset…"))

### B.   <u>Outrageous Government Misconduct</u>

The defendants also allege – without any factual basis – that they are the victims of outrageous government misconduct.  "In rare and extreme circumstances, a federal court has the authority to dismiss criminal charges as a sanction for government misconduct."  *United States v. Guzman*, 282 F.3d 56, 59 (1st Cir. 2002).  That power must be used "sparingly," however, and is "reserved for only the most appalling and egregious situations." *Id*. (*citing United States v. Santana*, 6 F.3d 1, 10 (1st Cir. 1993).  A defendant claiming misconduct must demonstrate that the government has engaged in behavior "so appalling and egregious as to violate due process by 'shocking ... the universal sense of justice.'" *United States v. Luisi*, 482 F.3d 43, 59 (1st Cir. 2007) (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)).  In other words, this is a high hurdle.  Indeed, although the First Circuit has confirmed the theoretical viability of this defense, the government could find no example of the First Circuit ever dismissing criminal charges because of outrageous government misconduct.  *Luisi*, 482 F.3d at 59 (citing cases); *Santana*, 6 F.3d at 4 ("The banner of outrageous misconduct is often raised but seldom saluted.").

Applying these standards to the facts of this case, it is apparent that both defendants' claims of prosecutorial vindictiveness and outrageous government misconduct fail.  Neither defendant has made a sufficient showing to warrant a hearing, much less dismissal of the indictment.[9]  Even

---

[9] The court may decide this motion on the papers; a hearing is not necessary.  *United States v. Lanoue*, 137 F.3d 656 (1st Cir. 1998) (proper to deny a vindictive prosecution motion after the record incorporated the parties' memoranda, including the government's candid explanation of the reasons for its prosecution, and the court heard argument.)

to obtain discovery, a defendant must present "some" objective evidence tending to show the existence of prosecutorial vindictiveness. *United States v. Bucci*, 582 F.3d 108, 113 (1st Cir. 2009). The standard is "rigorous" for the same reasons articulated in *Armstrong* and discussed in the government's previous briefing. *United States v. Armstrong,* 517 U.S. 456, 465 (1996); *see* Dkt. Nos. 68 at 7; 94 at 16-18. The defense has made no such showing.

### III.  ARGUMENT

The defense claims that the government vindictively punished Yu for exercising his right to trial and that his punishment came in the form of Chen's indictment. Dkt. No. 104 at 10. To proceed, the defendants must establish either actual vindictiveness or a presumption of it.

#### A.  There is No Evidence of Actual Vindictiveness.

To establish actual vindictiveness, a defendant must prove objectively that the prosecutor's charging decision was a "direct and unjustifiable penalty" that resulted "solely from the defendant's exercise of a protected legal right." *Goodwin,* 457 U.S. at 380, 384, n.19, n.11. For example, a defendant might produce evidence that a prosecutor actually said that he was bringing a new charge in order to dissuade the defendant from exercising his legal right. *United States v. Campbell*, 410 F.3d 456, 462 (8th Cir. 2005). This showing, however, is "exceedingly difficult to make." *United States v. Meyer,* 810 F.2d 1242, 1245 (D.C.Cir.1987). Here, there is no evidence of actual vindictiveness, and the defense alleges none.

#### B.  A Presumption of Vindictiveness Does Not Apply.

To establish a presumption of prosecutorial vindictiveness, the defendant must show that the circumstances of his case pose a "realistic likelihood" of vindictiveness that would be applicable in all cases with similar circumstances. *Blackledge v. Perry,* 417 U.S. 21, 27 (1974); *Goodwin,* 457 U.S. at 381. As Judge Gorton observed, this is a particularly difficult showing in a pretrial setting. *George*, 839 F. Supp. 2d at 441. The presumption does not arise just because action detrimental to the defendant was taken after the exercise of his legal rights; context is what matters and must present a reasonable likelihood of vindictiveness. *Goodwin,* 457 U.S. at 373. Thus, only in "rare instances" is the presumption applied. *United States v. Kriens,* 270 F.3d 597,

602 (8th Cir.2001).  It has never been applied in the context of plea bargaining, as alleged here, and it should not be applied here.

       1.    ***The Circumstances Do Not Pose a "Realistic Likelihood" of Vindictive Prosecution.***

The circumstances of this case do not pose a "realistic likelihood" of vindictive prosecution.  The defense cites *United States v. LaDeau* as a model for applying the presumption in a pretrial setting.  Dkt. No. 104 at 12; *United States v. LaDeau*, 734 F.3d 561 (6th Cir. 2013). In that case, the Sixth Circuit upheld a lower court's decision to apply the presumption after the government lost a suppression motion and then filed a more serious charge.  The *LaDeau* case is inapposite despite the defendant's claims to the contrary.  Dkt. No. 104 at 12.

The first of two factors supporting the court's finding of a vindictive prosecution presumption was that the *LaDeau* prosecution "already possessed all of the relevant evidence" supporting the superseding indictment when it sought its original indictment.  *LaDeau*, 734 F.3d at 568.  In contrast, here, the government developed significant new evidence between its indictments, as detailed above.  None of this evidence was known to the government at the time of its initial Grand Jury presentation.  And it is this evidence that directly supported and justified the Superseding Indictment's new charges, including those against Chen.

The second *LaDeau* factor was that the government filed its superseding indictment after LaDeau won his suppression motion.  This motion excluded crucial evidence and eliminated the government's ability to pursue any case under the original indictment.  *Id.* at 569.  The *LaDeau* court described this motion as a government "burden."  *Id.* at 568.  Here, the defense wrongly claims a similar dynamic: Because Yu has elected to go to trial, now the government will have "the burden" of conducting a jury trial.  Dkt. No. 104 at 13.  The comparison is not valid.

The government did not suddenly assume a trial burden when Yu's plea negotiations concluded.  As with every case charged by this office, the government has been cognizant of its burden to prove all charges beyond a reasonable doubt throughout this case – even before Yu was aware of the investigation and before he was charged in the original indictment.  Plea negotiations

did not change that burden; his choice to proceed to trial did not change it. The government made clear the possibility of bringing additional charges in December 2019. For the following ten months, it tried in good faith to negotiate a fair and just resolution. Indeed, the defense never even conveyed its reaction to the government's final message on the subject. Yet during that same ten-month period, the agents continued to uncover new evidence demonstrating the massive scope of Yu's illegal activities and his conspiracy with Chen. Seeking a Superseding Indictment that charged crimes relating to this new evidence was neither designed to punish Yu for exercising his Constitutional rights nor has it actually done so.

The comparison is also unhelpful because, in *LaDeau*, the government literally could not proceed in its case after the suppression ruling, which the court characterized as "a mortal blow." *LaDeau* at 569. Afterward, obtaining LaDeau's conviction on the initial charge became "not simply more of a chore" but "impossible." *Id.* That is why the court characterized the LaDeau's motion as placing a "significant" "burden" on the government. *Id.* at 568. Here, the government has suffered no circumstance that makes its case "impossible." The government's burden is the same as it is in every case and as it has been since the beginning of this one.

Finally, contrary to the defense's argument, the government does not "prefer to avoid" trial. Dkt. No. 104 at 13. The government is not intimidated by the task of presenting "a complex, trade secrets case." *Id.* Instead, the government welcomes trial and is prepared, as required by the Constitution, to prove every element of the charges beyond a reasonable doubt.[10]

## C.  Even if the Court Finds a Presumption, New Evidence Rebuts It.

The court should reject the defendants' arguments and refuse to find that this case is the rare exception warranting a pretrial presumption of prosecutorial vindictiveness. But even if the presumption were applied, the facts above would resoundingly rebut that presumption. The voluminous new evidence discovered after the original indictment provided the basis and context

---

[10] The defense reiterates its argument about the government wanting "to avoid [the] trouble" of trial near the end of its motion. *See* Dkt. No. 104 at 18. There is no evidence supporting this claim.

for the Superseding Indictment's new charges, including those against Chen. There is no evidence that the government is attempting to punish the defendants for exercising their rights.

New evidence is specifically the kind of objective reason that the Supreme Court and other courts have relied upon to defeat a presumption of prosecutorial vindictiveness in a pretrial setting. *See Goodwin*, 457 U.S. at 376 n.8; *United States v. Lanoue*, 137 F.3d 656 (1st Cir. 1998) (finding no vindictive prosecution where the government memorandum explained its reasons for prosecution, the "most important" being that the prosecutor had new evidence that had been unavailable when he previously dismissed the charge).[11] Here, new evidence gathered between the original and superseding indictments includes Chen's confession and description of her role in conceiving and fostering Tricon; bank records corroborating her statements and identifying her transmission of more than $75,000 to finance construction of the company's stolen computer chips; Win records exposing the defendants' communications and business with its unwitting manufacturer; and digital information detailing Yu's sales and marketing of computer chips abroad. With the exceptions of Counts 23 and 24, this evidence allowed the government to prove the elements of all of the new charges in the Superseding Indictment, including those lodged against Chen. The fact that the parties tried but failed to negotiate a resolution that obviated the need for a trial doesn't transform this case into one involving vindictive prosecution, coercion, or outrageous government misconduct.

### 1. *The New Evidence Justified Immigration Fraud Charges against Yu.*

The defense motion focuses on the consequences of the government's choice to bring immigration charges against Yu. Specifically, Superseding Indictment Count 23 alleges that Yu lied several times during his February 2017 citizenship interview when, for example, he affirmed

---

[11] *See also United States v. Campbell*, 410 F.3d 456 (8th Cir. 2005) ("There can be no prosecutorial vindictiveness if the prosecutor revised the charge because of newly discovered evidence …"); *Bragan v. Poindexter*, 249 F.3d 476 (6th Cir. 2001) (citing governmental discovery of previously unknown evidence as an example of an objective explanation rebutting a finding of a realistic likelihood of vindictiveness); *United States v. Nell*, 570 F.2d 1251, 1254–55 (5th Cir. 1978) (providing a list of various non-vindictive reasons for adding more serious charges, including obtaining "evidence of the additional crimes … after the first indictment").

under oath that he had never committed a crime for which he had not been arrested.  Dkt. No. 78 ¶¶ 25-26, 41.  These statements were false because, by the time of his interview, Yu had already stolen hundreds of computer files from his employer and contacted Win about manufacturing chips.  Superseding Indictment Count 24 further alleges that Yu told these lies under oath specifically to obtain U.S. citizenship.  *Id.* at ¶¶ 25-27, 43.

The defense focuses on these charges partly because, as it correctly notes, conviction penalties are severe, culminating in rescission of the offender's U.S. citizenship and potential deportation.  These serious consequences are one reason the government declined to include the charges in its initial indictment, even though it could have done so.  At that time, government investigators had obtained a copy of the defendant's immigration file, a standard practice in all cases involving a foreign national or naturalized citizen.  And by the time of the initial indictment, it was clear that Yu had taken advantage of the United States citizenship application process. Nevertheless, the government declined to allege immigration charges at the outset and made a good-faith effort to resolve the case without them.

However, after the Grand Jury issued the initial indictment, the government developed significant new evidence regarding the scope and character of the defendant's crimes.  Specifically, the government learned in new and concerning detail that Yu had stolen and still possessed exact copies of files describing how to make GaN technology chips, which are powerful and sensitive enough that the U.S. government requires that their production occur in the United States.

Yu's foreign marketing and sales were also more extensive than the government believed at the time of the initial indictment.  For example, only shortly after Yu had become a United States citizen, he proceeded with an international Turkish transaction in which he sold products that he knew had been manufactured using trade secrets he had stolen from ADI.  And he did so to benefit a foreign military.  Discovering this evidence changed the complexion of this case.  As the court itself has noted, "There is a world of difference between trade secret theft among American companies, and trade secret theft where one of the parties violates export controls or passes the stolen technology to a foreign entity."  Dkt. No. 89 at 4 (Order dated Oct. 9, 2020).  Here, the

16

forensic evidence gleaned from Yu's electronic devices showed that he was passing "stolen technology to a foreign entity." *Id.* In other words, the new information on Yu's computers did exactly what *Goodwin* contemplated – helped the government realize that other information already in its possession had greater significance. *Goodwin* at 381. It counseled in favor of new and more serious charges. Yu's transaction with Qilu Tech did the same. All of this evidence showed that Yu's case was far from a "run-of-the-mill" trade secrets dispute, as the defense has falsely characterized it. Dkt. No. 104 at 18. And it was this dimension of Yu's wrongdoing and its potential national security implications that informed the government's decision to bring immigration fraud charges. Doing so was within the government's discretion and in the interests of justice.

### D.   There is No Evidence of Outrageous Government Misconduct.

There is no basis for finding outrageous government misconduct here. The defense alleges that the government has fallen into this unethical and unprofessional abyss because it informed Yu that failure to reach a plea agreement might result in a superseding indictment charging Chen with criminal conduct and charging Yu with more serious crimes. Dkt. No. 104 at 16. The defense states that this was an unconstitutional attempt to coerce a plea from Yu. Dkt. No. 104 at 5. It also states that the scheme was tantamount to "threatening their two young children with the loss of their parents." Dkt. No. 104 at 16. The arguments are baseless.

#### 1.   *Enhanced Charges Against Yu Were Proper.*

The defense claims that the government attempted to coerce a guilty plea from Yu by informing his counsel that the government would seek a superseding indictment charging more serious crimes unless he pled. Dkt. No. 104 at 7. However, Supreme Court and First Circuit precedent endorse such plea bargains. "In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. at 364 (1978). There is no constitutional violation when a prosecutor carries out a threat, made during plea negotiations, to bring additional and more

serious charges against an accused who refuses to plead guilty. *Id.* That is exactly what happened here. And though unnecessary to rebut a claim of outrageous government misconduct, the argument above explains the government's rationale for bringing the immigration charges. That discretionary decision was sound.

> **2.**     **It is Not Coercive to Include Third-Party Benefits in Plea Negotiations.**

The defense also claims that the prosecution attempted to coerce Yu's guilty plea by threatening to indict his wife. Dkt. No. 104 at 7. However, informing Yu of Chen's potential criminal exposure – and giving Yu the opportunity to consider that in his own plea decision – is not coercive. It is the law of the First Circuit – and of every circuit that has examined the issue – that a plea agreement is not invalid because it includes leniency for a third party or because it is entered "in response to a prosecutor's justifiable threat to prosecute a third party." *United States v. Marquez*, 909 F.2d 738, 741–42 (2d Cir. 1990) (collecting cases); *see also* ALI Model Code of Pre-Arraignment Procedure § 350.3 commentary at 616-17 (1975) (noting unanimous rejection by ALI Council of recommendation to forbid plea bargains containing third-party benefits). The First Circuit specifically wrote in *Kent* that it was "not prepared to say that it can be coercion to inform a defendant that someone close to him who is guilty of a crime will be brought to book if he does not plead. If a defendant elects to sacrifice himself for such motives, that is his choice." *Kent v. United States*, 272 F.2d 795, 798 (1st Cir. 1959).

The defense cites *Lynumn v. Illinois*, 372 U.S. 528 (1963) to support its argument that the government attempted to coerce Yu's plea by threatening to charge his wife. Dkt. No. 104 at 7. It asserts that the prosecution here "sought to employ similarly coercive tactics." The comparison is utterly inapt. Lynumn was the single mother of two children, ages three and four. *Lynumn*, 372 U.S. at 531. When she confessed to marijuana possession and sale, she was surrounded in her apartment by three police officers and a two-time felon who had purportedly set her up. *Id.* at 534. She had just been arrested in the hallway outside her apartment. 372 U.S. at 531. She had no previous experience with the criminal law. *Id.* She had no friend or legal counsel to educate her about the ability of the police to take her children and their public support. *Id.* She had no reason

to doubt the officers who claimed that, without her confession, she might lose her children and their aid. *Id.* In her testimony, she recounted that she told the officers that she would say anything they wanted her to say. *Id.* at 531. "I asked what I was to say. I was told to say 'You must admit you gave Zeno the package,' so I said, 'Yes, I gave it to him.'" *Id.* at 531–32.

There is no legitimate comparison between this case and *Lynumn*. When Yu was informed of the possibility of charges against his wife, he was not a single woman in 1963, a mother of toddlers, surrounded by police, framed by a felon, arrested only minutes earlier, and alone without counsel. He was a highly educated and sophisticated engineer who had the benefit of private counsel, which he has continued to enjoy for nearly 23 months. His plea negotiations were not high-pressure environments in which he was told he might lose his children if he did not agree right there: He was arrested in June 2019. He was released from custody. The negotiations proceeded for at least ten months.

The defense's citation to *Jefferson* is also unhelpful. Dkt. No. 104 at 17-18; *United States v. Jefferson*, 315 F. Supp. 2d 1187 (M.D. Ala. 2004). In that case, the parties seem to have experienced a genuine misunderstanding about whether the defendant's plea had waived his right to appeal. Because of the misunderstanding, the defendant felt he desperately and unexpectedly had to choose nearly immediately between forgoing his appeal and risking his wife's indictment. "Fortunately for Jefferson, he had a prosecutor who, although she believed she had credible inculpatory evidence against Jefferson's wife, in the end commendably" agreed not to pursue it, given the circumstances. *Jefferson*, 315 F. Supp. 2d at 1188, 1189. Also fortunately for Yu, the government did not unexpectedly announce potential superseding charges against him or his wife and then demand an immediate answer about his intentions. Far from it. Yu had months to consider his Constitutional options, and unlike Jefferson's, the terms of his choice were informed.

### 3.    *The Government Has Not Threatened the Yu-Chen Children.*

The government wishes to make two additional points. The first regards the defense's repeated invocation of the defendants' children and the assertion that it has threatened the entire family with the children's "loss of their parents" by simultaneously charging both Yu and Chen.

Dkt. No. 104 at 1, 16. First, this court knows that, if both defendants are convicted, any risk of the Yu-Chen children being temporarily left without a parent can be mitigated with staggered sentences. Nonbinding Guidelines projections indicate Chen's suggested sentence would be about one year. Second, the government takes no joy in imagining the position of the Yu-Chen family. But it is the defendants who put themselves in this position – not by asserting their Constitutional rights, as they are free to do, but by committing crimes in the first place.

        **4.**      ***The Government Has Not Attacked the Institution of Marriage.***

The second point regards the defense's assertion that, in charging both Yu and Chen, the government somehow "sullied … the institution of marriage." Dkt. No. 104 at 15. The idea is preposterous. The government reveres this institution as much as the defense. But both parties know – and the court knows – that the law does not suffer spousal conspirators. Husbands and wives can be charged together when they commit crimes together.[12] Even the marital communication privilege does not apply when husband and wife commit a crime together.

In short, none of the government's conduct here was illegal, unethical, or even particularly unusual. It cannot be "outrageous" when it fits the definition of conduct explicitly condoned by the Supreme Court, the First Circuit, and other courts. The defense has described nothing worthy of the first finding in this circuit of outrageous government misconduct.

    **E.**    **The Defense Has Not Met Its Burden for Discovery.**

The defense has not met its "rigorous" burden for discovery. *Bucci*, 582 F.3d at 113; *Armstrong,* 517 U.S. at 465. It has not even described what discovery it would like to request. Further, all evidence cited in this motion is either correspondence between the parties or discovery that has already been produced and that was available to the defense prior to the filing of its motion.

//

---

[12] *See, e.g., United States v. Giudice, et. al.* (D. NJ. No 2:13-cr-00495-ES) (husband and wife charged while they had four young children; both were sentenced to jail; conviction resulted in husband's deportation).

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the defendants' motion to dismiss in its entirety without holding an evidentiary hearing or granting the defendants' motion for discovery.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By:    <u>/s/ Amanda Beck</u>
AMANDA BECK
JASON A. CASEY
JOHN A. CAPIN
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

_/s/ Amanda Beck_____
AMANDA BECK
Assistant United States Attorney

Date: May 3, 2021